1

2

3

4

5

6

7

8                         IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANGELA SHANKLES,

11          Plaintiff,                          No. 2:09-cv-01258-KJN

12      v.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
14
            Defendant.                          ORDER
15   _____/

16          Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") denying plaintiff's request for Supplemental Security Income under

18   Title XVI of the Social Security Act.[1]  Plaintiff contends that the Administrative Law Judge

19   ("ALJ") erred by:  (1) determining that there are jobs in significant numbers in the national

20   economy that plaintiff can perform despite plaintiff's mental impairments; (2) determining that

21   plaintiff was able to perform jobs in the national economy without first consulting a Vocational

22   Expert ("VE"); (3) failing to properly assess plaintiff's non-mental impairments at step two of

23   the required five-step analysis; and (4) failing to properly document his findings regarding

24

25          [1]  This case was referred to the undersigned pursuant to Eastern District of California
     Local Rule 302(c)(15) and 28 U.S.C. § 636(c), and both parties have voluntarily consented to
     proceed before a United States Magistrate Judge.  (Dkt. Nos. 9, 10.)  This case was reassigned to
26   the undersigned by an order entered February 9, 2010.  (Dkt. No. 20.)

plaintiff's mental impairments in accordance with 20 C.F.R. § 416.920a and the Commissioner's

Hearings, Appeals, and Litigation Manual ("HALLEX") I-2-8-25C(2).  (Pl.'s Mot. for Summ. J.

("Pl.'s Mot."), Dkt. No. 17.)  The Commissioner filed a cross-motion for summary judgment.

(Def.'s Opp'n & Cross-Motion for Summ. J., Dkt. No. 19.)  Plaintiff filed a reply to defendant's

motion.  (Pl.'s Reply to Def.'s Opp'n & Cross-Motion for Summ. J. ("Pl.'s Reply"), Dkt.

No. 21.)

　　　　For the reasons that follow, the court denies plaintiff's motion for summary

judgment in part, grants the Commissioner's cross-motion for summary judgment in part, and

remands this case to the agency for further proceedings consistent with this order.

I.　　BACKGROUND

　　A.　　Procedural Background

　　　　On January 3, 2006, plaintiff filed an application for Supplemental Security

Income ("SSI").  (Administrative Transcript ("AT") 31.)  Plaintiff alleged a disability onset date

of December 1, 2000.  (AT 44, 46.)  Following an initial denial of her claims, plaintiff filed a

Request for Reconsideration that was subsequently denied on February 7, 2006.  (AT 12, 36, 37.)

Plaintiff timely filed a request for a hearing, and the ALJ conducted a hearing on October 29,

2008.  (AT 35, 135.)  At the hearing, the ALJ heard testimony only from plaintiff.  (AT 40, 135.)

The ALJ also considered written statements submitted by plaintiff's sister, Teddi Hamilton, and

plaintiff's husband, William Shankles.  (AT 17, 166-69.)

　　　　In a decision dated February 2, 2009, the ALJ denied plaintiff's application,

finding that there were a significant number of jobs in the national economy that plaintiff could

perform despite some limitations in her residual functional capacity.[2]  (AT 20.)  The ALJ's

---

　　[2]  Generally speaking, SSI is paid to disabled persons with low income.  See 42 U.S.C. §§ 1382 et seq.  Under the SSI benefit scheme, the term "disability" is defined, in part, as an "inability to engage in any substantial gainful activity" due to "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §

1   decision became the final decision of the Commissioner when the Appeals Council denied

2   plaintiff's request for review on April 17, 2009.  (AT 2-5.)  Plaintiff seeks judicial review of the

3   denial of her application.

4           B.      Summary of Relevant Medical History and Evidence

5           At the time of her hearing before the ALJ, plaintiff was 39-years-old and had not

6   worked since approximately 2003.  (AT 31, 62.)  Plaintiff completed the ninth grade of high

7   school and received her diploma through home schooling in approximately 2002.  (AT 139-40.)

8   Plaintiff had worked doing yard-duty and bus-duty for her daughter's school, but quit amidst an

9   incident involving her daughter's classmate.  (AT 143-46.)  Prior to that time, plaintiff worked as

10  a dietary aide and for a Burger King restaurant.  (AT 146.)

11

12  1382c(a)(3)(A).  A five-step sequential evaluation governs eligibility for benefits.  See 20 C.F.R.
    §§ 416.920, 416.971-76; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Ninth

13  Circuit Court of Appeals has summarized the sequential evaluation as follows:

14              Step one:  Is the claimant engaging in substantial gainful
                activity?  If so, the claimant is found not disabled.  If not, proceed
                to step two.

15

16              Step two:  Does the claimant have a "severe" impairment?
                If so, proceed to step three.  If not, then a finding of not disabled is
                appropriate.

17

18              Step three:  Does the claimant's impairment or combination
                of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
                404, Subpt. P, App.1?  If so, the claimant is automatically

19              determined disabled.  If not, proceed to step four.

20              Step four:  Is the claimant capable of performing his past
                work?  If so, the claimant is not disabled.  If not, proceed to step

21              five.

22              Step five:  Does the claimant have the residual functional
                capacity to perform any other work?  If so, the claimant is not

23              disabled.  If not, the claimant is disabled.

24  Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

25      The claimant bears the burden of proof in the first four steps of the sequential evaluation
    process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential

26  evaluation process proceeds to step five.  Id.

Plaintiff first sought medical treatment relative to her condition herein on August 17, 2004, at Midtown Medical Center ("MMC").  (AT 130.)  Plaintiff complained of a right knee fracture after an auto accident.  (Id.)  An x-ray revealed that there was no fracture.  (AT 122.) From August 24, 2004, through December 29, 2004, plaintiff was prescribed Vicodin,[3] Ultram,[4] and Soma.[5] (AT 121, 126, 127, 128, 196-98, 270.)

Plaintiff returned to MMC on June 1, 2005, and was prescribed Lexapro[6] and Seroquel.[7] (AT 125.)  In January 2006, plaintiff presented to MMC for a physical examination and complained of depression.  (AT 124.)  Plaintiff was prescribed Zoloft[8] as a replacement for Lexapro.  (Id.)

Plaintiff presented to Timothy Canty, M.D., for a psychiatric evaluation on February 2, 2006.  (AT 109.)  Plaintiff's primary complaint was that she was "not so good with people," and she indicated that her mood had improved with medications.  (Id.)  Plaintiff reported that she was taking Seroquel and Zoloft.  (Id.)  Plaintiff reported that she had not sought

---

[3]  Vicodin is a combination of the drugs acetaminophen and hydrocodone indicated for the relief of moderate to moderately severe pain.  See Physicians' Desk Reference 560 (64th ed. 2010).

[4]  Ultram is a brand name for the drug tramadol, which is an analgesic indicated for the management of moderate to moderately severe chronic pain in adults.  See Physicians' Desk Reference 2693-94 (64th ed. 2010).

[5]  Soma is a brand name for the drug carisoprodol, which is a muscle relaxant that is indicated for the treatment of "acute, painful musculoskeletal conditions in adults."  See Physicians' Desk Reference 1931 (63rd ed. 2009).

[6]  Lexapro is a brand name for the drug escitalopram oxalate, which is indicated for the treatment of major depressive disorder and generalized anxiety disorder.  See Physicians' Desk Reference 1160-61 (64th ed. 2010).

[7]  Seroquel is a brand name for the drug quetiapine fumarate, which is indicated for the treatment of bipolar disorder and schizophrenia.  See Physicians' Desk Reference 751-52 (64th ed. 2010).

[8]  Zoloft is indicated for the treatment of, among other conditions, major depressive disorder, obsessive-compulsive disorder, panic disorder, and social anxiety disorder.  See Physicians' Desk Reference 2588 (61st ed. 2007).

1   mental-health treatment "but was placed on a 72-hour hold after she complained of suicidal

2   ideation while in jail." (Id.)

3            Dr. Canty diagnosed plaintiff's DSM-IV characteristics as follows:

4            Axis I: Methamphetamine dependence in remission per claimant, Anxiety
                     disorder NOS.
5            Axis II: None.
             Axis III: Deferred.
6            Axis IV: Mild.
             Axis V: 65/70.[9]
7   (AT 111.)

8            Dr. Canty determined that plaintiff had the cognitive ability to manage money, but

9   that she "would not do well in a public or overly stressful job." (AT 112.) Dr. Canty stated that

10  plaintiff would not have difficulty in "most nonpublic, simple jobs." (Id.) Lastly, Dr. Canty

11  reported that plaintiff's anxiety would not interfere with attending work that she was highly

12  motivated to perform, but that she would probably do best with a limited number of coworkers

13  and supervisors. (Id.)

14           On February 24, 2006, plaintiff returned to MMC complaining of left arm pain

15  and headaches. (AT 239.) The chart note indicated that plaintiff's depression was "controlled on

16  Zoloft." (Id.)

17           During March and April of 2006, plaintiff continued to be seen at MMC for

18  headaches and depression. (AT 281, 283.) Plaintiff was prescribed Imitrex,[10] but on May 17,

19  2006, she complained that the medication was not helping with her headaches. (AT 279, 283.)

20  _____

21       [9] Axis V classifies a person's Global Assessment of Functioning ("GAF"). American
     Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 25 (4th ed. 1994)
22   ("DSM-IV"). The GAF is assessed on a scale of 1-100 and is used for reporting the clinician's
     judgment of an individual's overall level of functioning. Id. at 30. A GAF of 61 to 70 indicates
23   "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social,
     occupational, or school functioning (e.g., occasional truancy, or theft within the household), but
24   generally functioning pretty well, has some meaningful interpersonal relationships." Id. at 32.

25       [10] Imitrex is a brand name for the drugs sumatriptan and sumatriptan succinate, and is
     indicated, in part, for the treatment of migraine headaches. See Physicians' Desk Reference
26   1497-98, 1503-04 (64th ed. 2010).

Plaintiff also complained that she had low back pain since 2004 when she underwent a procedure to treat kidney stones.  (AT 279.)  On July 25, 2006, plaintiff was prescribed Topomax[11] for her headaches, and on August 25, 2006, plaintiff reported that Topomax helped.  (AT 233, 234.)

During the remainder of 2006 and early 2007, plaintiff continued to visit MMC and was prescribed medication for migraines, anxiety, and depression.  (See AT 228-32.)  On February 23, 2009, plaintiff complained of chest pain and was diagnosed with gastroesophageal reflux disease ("GERD").  (AT 227.)  Plaintiff's GERD symptoms were treated with Prevacid,[12] and she was prescribed Xanax.[13]  (Id.)

On May 17, 2007, plaintiff presented to Mercy San Juan Hospital and was diagnosed with acute lumbar strain.  (AT 192.)  On May 29, 2007, plaintiff returned to MMC complaining of back pain and was prescribed Flexeril.[14]  (AT 224.)

Between June 28, 2007, and July 3, 2008, plaintiff continued to be treated at MMC on an approximately monthly basis for a number of health reasons including anxiety, depression, headaches, low back pain, and cough.  (AT 210-13, 217-23.)  During this time period, plaintiff was treated with the following medications: Zoloft, Xanax, Seroquel, Ultram, Flexeril, and Topomax.  (Id.)

On July 12, 2008, plaintiff presented to Mercy San Juan Hospital where she was diagnosed with colitis.  (AT 195.)  Plaintiff followed up regarding her colitis symptoms at MMC

---

[11]  Topamax is a brand name for the drug topiramate and is indicated for treatment of seizures and migraine headaches.  See Physician's Desk Reference 2380 (62nd ed. 2008).

[12]  Prevacid is a brand name for the drug lansoprazole, which is used to decrease "the amount of acid produced in the stomach.  See Physicians' Desk Reference 3271 (61st ed. 2007)

[13]  Xanax is a brand name "tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders."  Burger v. Astrue, 536 F. Supp. 2d 1182, 1189 n.8 (C.D. Cal. 2008) (citing The PDR Family Guide to Prescription Drugs 742 (9th ed. 2000)).

[14]  Flexeril is a muscle relaxant.  See Bishop v. Sullivan, No. Civ S-90-1305-GGH, 1992 WL 120376, at *3 n.3 (E.D. Cal. Mar. 11, 1992) (unpublished) (citing Physicians' Desk Reference 1424 (45th ed. 1991)).

on July 16, 2008, and July 24, 2008.  (AT 208, 209.)  On August 4, 2008, plaintiff presented to MMC complaining of right side back pain and left side "belly pain."  (AT 206.)  Plaintiff's corresponding chart note reported colitis, abdominal pain which required a colonoscopy, GERD which was treated with Prilosec,[15] constipation, anxiety which was treated with Xanax, depression which was treated with Zoloft, headaches which were treated with Topomax, and low back pain which was treated with Flexeril and Ultram.  (Id.)

On August 28, 2008, an ultrasound of plaintiff's abdominal region identified a calculus[16] measuring 5.0 x 2.3 mm in plaintiff's left kidney.  (AT 252.)  The ultrasound also revealed that plaintiff's "pancreas is echogenic consistent with atrophy."  (Id.)

A radiological report dated September 2, 2008, revealed that plaintiff had "two adjacent calcifications projecting over the inferior pole left kidney measuring 3 and 4 mm."  (Id.) From September 2, 2008, to October 1, 2008, plaintiff continued treatment at MMC and complained of left side stomach pain, nausea, vomiting, sharp pain in her lower back, and anxiety.  (AT 202-04.)

On October 7, 2008, plaintiff presented to Mercy San Juan Hospital.  (AT 194.) A CT scan of her abdomen and pelvis revealed calcified granuloma at plaintiff's right lateral lung base and multiple old calyceal stones in her left kidney.  (Id.)  The report indicated that plaintiff was at risk for episodes of left sided renal colic and that the colitis that had been present on a scan from the previous July had been resolved.  (Id.)

On October 8, 2008, plaintiff presented to MMC complaining of blood in her urine, and kidney pain.  (AT 201.)  During her October 28, 2008 visit to MMC, plaintiff also

---

[15]  Prilosec is a brand name medication used to treat the symptoms of frequent heartburn. See Physicians' Desk Reference 2565-66 (63rd ed. 2009).

[16]  A calculus, or stone, is a "concentration formed in any part of the body, most commonly in the passages of the biliary and urinary tracts; usually composed of salts of inorganic or organic acids, or of other material such as cholesterol."  Stedman's Medical Dictionary 289 (Lippincott Williams & Wilkins, eds., 28th ed. 2006).

1    complained of lower back pain and left side stomach pain.  (AT 200.)  The diagnosis and

2    treatment plan taken from the chart notes of these two visits are as follows: renal stones for

3    which plaintiff was to be referred to urology; obesity which listed "lifestyle" as a treatment plan;

4    GERD, which was treated with Prilosec; depression, which was treated with Zoloft; anxiety,

5    which was treated with Xanax; headaches, which were treated with Topomax; chronic low back

6    pain, which was treated with Vicodin and Flexeril; shingles, which was treated with Acyclovir;[17]

7    bipolar disorder, which was treated with Seroquel; and colitis.  (AT 200-01.)

8           Meanwhile, on October 15, 2008, plaintiff presented to John T. Hata, M.D.,

9    complaining of abdominal pain, blood in her stool, and GERD.  (AT 250.)  Dr. Hata reported that

10   plaintiff suffered from chronic anxiety and that plaintiff's prescribed medications included:

11   Prilosec, Seroquel, Zoloft, Vicodin, Xanax, Topomax, and Flexeril.  (Id.)  Plaintiff further

12   complained of episodic lower back pain and shingles.  (Id.)  Plaintiff also stated that the onset of

13   her heartburn was four years ago and that the problem had not resolved.  (Id.)  Dr. Hata reported

14   that plaintiff was stable on Prilosec and should continue treatment with medication.  (AT 251.)

15          On October 23, 2008, plaintiff was referred by her attorney to Michelina Regazzi,

16   Ph.D., for a psychological evaluation.  (AT 272.)  With regard to her medical history, plaintiff

17   reported that was recently told she had colitis and that she was being treated for kidney stones.

18   (Id.)  Plaintiff reported that her medications included Xanax, Prochlorperazine,[18] Vicodin "for the

19   kidney stones," Flexeril, Topomax, Seroquel, Zoloft, and Prilosec.  (Id.)

20          Plaintiff reported that she had been taking psychiatric medication on and off for

21   years, although she had never been admitted to a psychiatric facility.  (Id.)  Plaintiff further

22

23          [17]  Acyclovir is an antiviral drug that is "active against herpes viruses."  Physicians' Desk
     Reference 1760 (64th ed. 2010).

24          [18]  Prochlorperazine is an anti-psychotic medication used to treat psychotic disorders such
25   as schizophrenia, and is also used on a short-term basis to treat anxiety not controlled by other
     medications.  It is also used to control severe nausea and vomiting.  Medline Plus, available at
26   http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682116.html (last visited December 8,
     2010).

8

1  reported that she had recently tried to get into counseling but there were problems with her

2  insurance.  (Id.)

3  With regard to her substance abuse history, plaintiff reported that she had last

4  used "crank" over 16 years ago.  (AT 273.)  Dr. Regazzi noted that this was not consistent with

5  plaintiff's 2006 psychiatric evaluation.  (Id.)

6  With regard to her daily activities, plaintiff stated that while her husband did most

7  of the cooking, she was able to clean the house.  (AT 274.)  Plaintiff stated that she was fearful of

8  driving and that she received rides from her mother or sister.  (Id.)  Plaintiff further stated that her

9  husband handled the finances but she was able to do the grocery shopping with him.  (Id.)

10  Dr. Regazzi reported that at the start of the mental status examination plaintiff

11  was "quite anxious," but that her anxiety dissipated within "about ten minutes."  (Id.)  When

12  asked to describe her predominant mood, plaintiff responded that sometimes she became agitated

13  and "sometimes [she was] okay."  (Id.)  Plaintiff reported that a lot of times she felt

14  overwhelmed.  (Id.)

15  With regard to plaintiff's test results, Dr. Regazzi reported that plaintiff's reading

16  ability was low average and "equivalent to the 8th grade level," while her spelling and arithmetic

17  scores fell within the deficient range.  (AT 275.)  Plaintiff's intellectual functioning was tested by

18  her performance on the Wechsler Adult Intelligence Scale.  (Id.)  Plaintiff's verbal

19  comprehension index score was 80 while her perceptual organization index score was 116.  (Id.)

20  Dr. Regazzi reported that a "discrepancy of this magnitude is uncommon and points to a relative

21  weakness in cognitive skills."  (Id.)

22  Dr. Regazzi diagnosed plaintiff as follows:

23  Axis I: Anxiety Disorder, NOS; Learning Disorder, NOS.
    Axis II: No Diagnosis.

24  Axis III: Colitis, kidney stones, by report.
    Axis IV: None.

25

26

1          Axis V: 58.[19]

2  (AT 276.)

3        Based on her evaluation of plaintiff, Dr. Regazzi assessed the following

4  capabilities and limitations solely with respect to mental factors and without consideration of any

5  of plaintiff's reported physical limitations: while plaintiff has moderate impairments in her daily

6  living activities, she "is capable of carrying out all personal care and daily living activities";

7  plaintiff is able to understand, carry out, and remember simple written or oral instructions in a

8  workplace with few coworkers and no contact with the public; plaintiff has moderate impairment

9  in her ability to communicate or interact with coworkers and supervisors and severe impairment

10  in dealing with the public due to her anxiety; plaintiff has no significant impairment in her ability

11  to attend work on a regular basis, moderate impairment in her ability to follow safety standards,

12  and marked impairment in her ability to deal with unexpected situations that might arise in the

13  course of a workday; plaintiff had moderate to marked impairment in her ability to maintain

14  stable emotional functioning in the workplace and; if granted disability benefits, plaintiff is

15  capable of managing her own funds.  (Id.)

16      C.   Summary of Relevant Hearing Testimony and Witness Statements

17        At the administrative hearing, plaintiff testified that she was enrolled in special

18  education while in high school and had trouble reading.  (AT 140-41.)  Plaintiff testified that she

19  was able to read children's books but has trouble with comprehension when reading the

20  newspaper.  (AT 141-42.)  She also testified that she does not spell very well, that she would be

21  able to write a letter only if it contained basic words, and that she is only able to complete basic

22  arithmetic.  (AT 142-43.)  Plaintiff explained that she had trouble with her memory and

23  attributed it to her medication.  (AT 147.)

24

25     [19]  A GAF of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school

26  functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

1      Plaintiff testified that at the time of the hearing, she was prescribed Seroquel,

2   Zoloft, Vicodin for kidney stones and a past case of shingles, Flexeril for muscle spasms,

3   Topomax for migraines, Xanax, and Prochlorperazine for nausea.  (AT 147-48.)  Plaintiff

4   attributed her nausea to "problems with my bowels" and testified that she had recent back pain.

5   (AT 148.)

6      Plaintiff testified that she had been seeing a specialist due to kidney stones and her

7   back was in constant pain.  (AT 148-49.)  She testified that no x-rays had been taken despite her

8   back complaints.  (AT 149.)  Plaintiff testified that she had colitis.  (Id.)

9      Plaintiff testified that despite taking medication, she experienced migraine

10  headaches at least three to four times per week that left her unable to function on those days.

11  (AT 149-50.)  She further testified that her colitis continued to give her problems and that it

12  affected her daily activities.  (AT 150-51.)

13     Plaintiff also testified that she experienced severe anxiety and panic attacks.  (AT

14  151.)  She explained that these symptoms were brought on by being in a room with a lot of

15  people and left her feeling like she was gasping for air.  (Id.)  Accordingly, plaintiff testified that

16  if she did the shopping, she was only able to do it at night; that if she had anywhere to go, she

17  was driven by her mom or her daughter because she would get panic symptoms when she drove;

18  and that she avoided crowds and new surroundings.  (AT 152.)

19     Plaintiff testified that she watched television and movies during the day and that

20  while she was able to keep her bedroom neat, her children did the majority of the housework.

21  (AT 152-53.)  She explained that she had trouble watching her grandson without help from her

22  husband because she did not feel good.  (AT 153-54.)  Plaintiff further testified that she believed

23  her anxiety caused problems at her yard-duty and dietary aide jobs.  (AT 154.)  Plaintiff testified

24  that although losing these positions ended up hurting her self-esteem, she "was good" at the time

25  she was doing these respective jobs.  (Id.)  Finally, plaintiff testified that she had always had

26  problems with anxiety and that she was unable to socialize with people outside of her family.

1   (AT 154-55.)

2          Plaintiff's husband, William Shankles, wrote a statement indicating that during

3   the prior seven years, plaintiff had suffered from "severe bouts of depression, social anxiety, and

4   confidence issues" resulting in plaintiff "seldom leaving the comfort/safety of her own home."

5   (AT 166.)  Mr. Shankles further wrote that plaintiff's anxiety necessitated that he perform more

6   of the everyday tasks and that plaintiff lacked the ability to work or deal with society.  (AT 166-

7   67.)

8          Plaintiff's sister, Teddi Hamilton, wrote a statement indicating that plaintiff had

9   transformed into someone "who seldom leaves the safety of her home."  (AT 168.)  Ms.

10  Hamilton further wrote that plaintiff did not drive due to anxiety and did not like to be in closed

11  spaces.  (Id.)  Ms. Hamilton also stated that plaintiff was unable to be in a room with many

12  people without becoming overwhelmed to the point of tears.  (Id.)  Ms. Hamilton explained that

13  she had seen plaintiff become more physically ill in recent years to the point of being unable to

14  hold a job.  (AT 169.)

15          D.    Summary of the ALJ's Findings

16          The ALJ conducted the required five-step evaluation and concluded that plaintiff

17  had not been disabled from January 3, 2006, through the date of the ALJ's decision.  (AT 20.)  At

18  step one, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since

19  January 3, 2006, plaintiff's application date.  (AT 14.)

20          At step two, the ALJ found that plaintiff suffered from the following severe

21  impairments: panic attacks and bipolar disorder.  (Id.)  The ALJ determined that plaintiff's

22  impairments resulted in "more than minimal limitations" in her ability to "perform work related

23  physical and mental tasks."  (Id.)  The ALJ also found that plaintiff's headaches did not result in

24  significant physical limitations and that plaintiff seemed to be "doing fairly well" on her

25  medication, Topomax.  (Id.)  The ALJ did not address any of plaintiff's other physical

26  impairments in the portion of his order specifically addressing step two.  (Id.)

1    At step three, the ALJ determined that plaintiff's impairments, whether alone or in

2    combination, did not meet or medically equal any impairment listed in the applicable regulations.

3    (Id.)  The ALJ assessed plaintiff's residual functional capacity ("RFC") as follows:

4        Having considered all of the evidence of the entire record and testimony of record,
         the undersigned finds that the claimant has no exertional limitations.  She can

5        perform unskilled work, with no frequent interaction with coworkers or
         supervisors and no public jobs.

6

7    (Id.)

8    At step four, the ALJ found that plaintiff was incapable of performing her past

9    work as a dietary aide because the duties required by that position were in excess of her current

10   RFC.  (AT 19.)  At step five, the ALJ concluded that although plaintiff's ability to perform work

11   at all exertional levels had been compromised by her non-exertional limitations, these limitations

12   had little or no effect on the occupational base of unskilled work at all exertional levels.  (AT

13   20.)  Accordingly, the ALJ determined that a finding of "not disabled" was appropriate under

14   Medical-Vocational Guidelines section 204.00.  (Id.)  Therefore, the ALJ determined that

15   plaintiff had not been under a disability, as defined in the Social Security Act, from her filing

16   date through the date of the ALJ's decision.  (Id.)

17   II.    ISSUES PRESENTED

18   Plaintiff contends that the ALJ committed the following errors in denying her

19   claim.  First, plaintiff argues that the ALJ erred by failing to find that plaintiff's physical

20   limitations were severe at step two of the five-step analysis.  Second, although buried in a

21   footnote, plaintiff cursorily argues that the ALJ erred at step three of the sequential analysis by

22   failing to properly document his findings regarding plaintiff's inability to satisfy the "B" criteria

23   contained in the appropriate listing.  Finally, plaintiff contends that the ALJ erred by determining

24   that there were significant jobs in the national economy that plaintiff could perform despite

25   plaintiff's mental impairments, and that the ALJ erred in making this determination without the

26   aid of a VE.

III.    STANDARDS OF REVIEW

       The court reviews the Commissioner's decision to determine whether it is: (1) free of legal error, and (2) supported by substantial evidence in the record as a whole.  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009).  This standard of review has been described as "highly deferential."  Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).  "'Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Andrews, 53 F.3d at 1039.

       Findings of fact that are supported by substantial evidence are conclusive.  42 U.S.C. § 405(g); see also McCarthy v. Apfel, 221 F.3d 1119, 1125 (9th Cir. 2000).  "Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's."  Bray, 554 F.3d at 1222 (citing Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007)); see also Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld.") (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).  However, the court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'"  Ryan, 528 F.3d at 1198 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)); accord Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  Plaintiff bears the burden of proving she is disabled with the meaning of the Act.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (citing Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999)).

////

////

14

1    IV.    ANALYSIS

2           A.    The ALJ Did Not Err at Step Two

3                  Plaintiff argues that the ALJ erred by failing to find that plaintiff had any severe

4    physical impairments at step two of the required analysis and, therefore, the ALJ improperly

5    assessed plaintiff's RFC.  (Pl.'s Mot. at 8.)  The Commissioner argues that the ALJ did not err

6    because the proper inquiry is whether plaintiff's impairments affect her ability to work, "not

7    simply whether the plaintiff experiences a medical condition or abnormality."  (Def.'s Opp'n &

8    Cross-Motion for Summ. J. at 6.)

9                  At step two, the ALJ is required to determine if plaintiff has a severe impairment.

10   "An impairment or combination of impairments may be found not severe only if the evidence

11   establishes a slight abnormality that has no more than a minimal effect on an individual's ability

12   to work."  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Smolen v. Chater, 80

13   F.3d 1273, 1290 (9th Cir. 1996)) (internal quotation marks omitted).  In other words, an

14   impairment is not severe if it does not significantly limit a claimant's physical or mental ability to

15   do basic work activities.  20 C.F.R. § 404.1521.  At step two, an ALJ's decision that plaintiff

16   lacks a medically-severe impairment or combination of impairments must be supported by

17   clearly established medical evidence.  Webb, 433 F.3d. at 687 (quoting Social Security Ruling

18   ("SSR") 85-28[20]) (internal quotation marks omitted).

19                  Here, the ALJ found that plaintiff suffered from two severe mental impairments:

20   panic attacks; and bipolar disorder.  (AT 14.)  Plaintiff argues that the ALJ erred by finding that

21   plaintiff's headaches were not severe and by not addressing plaintiff's noted conditions of colitis,

22   kidney stones, chronic low back pain, obesity, and GERD insofar as step two is concerned.  (Pl.'s

23

24           [20]  The Secretary of Social Security issues SSRs to clarify the Secretary's regulations and
     policies.  See Paulson v. Bowen, 836 F.2d 1249, 1252 n.2 (9th Cir. 1988).  Although SSRs do
25   not have the force of binding law, the Ninth Circuit Court of Appeals "nevertheless give[s]
     deference to the Secretary's interpretation of its own regulations."  Bunnell v. Sullivan, 947 F.2d
26   341, 346 (9th Cir. 1991).

1   Mot. at 6.)  Specifically, plaintiff argues that the October 7, 2008 abdominal CT scan, which

2   showed evidence of "old stones" and contained a "reference to Mrs. Shankles being at risk for

3   kidney colic," would "seem to establish a medically determinable impairment, the pain from

4   which would at least occasionally interfere with performing work."  The undersigned disagrees.

5   After careful review, the undersigned finds that the ALJ properly addressed all of plaintiff's

6   physical impairments, albeit, not specifically in the portion of the decision contained under the

7   step two heading.  Although the ALJ only addressed plaintiff's headaches in that express, step

8   two discussion (AT 14), he subsequently discussed plaintiff's physical impairments and the

9   corresponding medical evidence when assessing plaintiff's RFC.  (See AT 15-19.)

10              Substantial evidence supports the ALJ's decision that plaintiff's non-mental

11   impairments were not severe.  With regard to plaintiff's physical impairments, in the step two

12   analysis the ALJ wrote that the "evidence shows that the claimant's headaches do not appear to

13   result in any significant physical limitations.  The claimant was prescribed Topomax and seemed

14   to be doing fairly well on this medication."  (Id.)  Evidence showing plaintiff's symptoms are

15   controlled by medication tends to support a finding of no disability.  Warre v. Comm'r of Soc.

16   Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006).  Plaintiff indicated on May 17, 2006, that her

17   medication, Imitrex, was "not helping" with her migraine headaches.  (AT 279.)  Plaintiff's

18   medical records indicate that her prescription was changed to Topomax on July 25, 2006.  (AT

19   234.)  The ALJ wrote that plaintiff "seemed to be doing fairly well" on Topomax and that after

20   reviewing plaintiff's medical records, the ALJ "notes that the claimant has not been hospitalized,

21   or to the emergency room with complaints nor has she described any side effects from her

22   medications."  (AT 14, 16.)  While plaintiff's medical records list headaches as an ongoing

23   impairment, there is no indication that the headaches were increasing in severity, that they were

24   not properly controlled with medication, or that they impaired her ability to work.  Accordingly,

25   the ALJ pointed to substantial evidence and did not err by finding that plaintiff's headaches were

26   not severe.

1        The ALJ also did not err by finding that plaintiff's other physical impairments

2   were not "severe."  While acknowledging plaintiff's "numerous physical complaints," the ALJ

3   wrote that the "minimal clinical findings do no justify the claimant's contention that they keep

4   her from working."  (AT 18.)  While the ALJ's discussion of plaintiff's other physical

5   impairments is limited,[21] the ALJ pointed to sufficient evidence in the record to support the

6   conclusion that plaintiff's physical impairments did not significantly limit plaintiff's ability to

7   work.  The ALJ found that "[f]indings have been very minimal.  There is no evidence of atrophy,

8   weakness, deformity, muscle tenderness or spasms, anatomically consistent sensation changes or

9   reflex changes" and "claimant stated that she was sleeping better with Seroquel."  (Id.)

10        Substantial evidence in the record supports the ALJ's conclusion.  While

11   plaintiff's medical records contain evidence of physical impairments, there is no objective

12   evidence to support the conclusion that they were of such severity to limit her ability to work.

13   Indeed, aside from a November 24, 2004 chart note indicating that plaintiff's knee pain prevented

14   her from participating in walking or prolonged standing until February 1, 2005, plaintiff's

15   medical records do not evidence that her physical impairments placed functional limitations on

16   her ability to work.  (AT 197.)  Plaintiff's medical records, paired with her conservative

17   treatment, support the ALJ's finding that plaintiff's non-mental impairments were not severe

18   within the meaning of the Act.[22]  Because plaintiff has failed to meet her burden of proving that

19   her physical impairments significantly limited her ability to do basic work activities, the ALJ did

20   not err by failing to find plaintiff's non-mental impairments as severe at step two of the analysis.

21   See Bowen, 482 U.S. at 141 (citations and internal quotation marks omitted); Matthews v.

22

23        [21]  The ALJ lists the majority of plaintiffs impairments in a single sentence.  "She was
24   treated for various complaints of shingles, migraine headaches, depression, low back pain, colitis,
     obesity."  (AT 18.)

25        [22]  The ALJ also stated that plaintiff "has not received or been referred for trigger point
26   injections, acupuncture, or chiropractic treatment" and that there are "no emergency room
     treatments, no surgeries, or hospitalization."  (AT 18.)

1  Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (holding that the mere existence of an impairment is

2  insufficient proof of a disability and that plaintiff bears the burden of proving that an impairment

3  is disabling).

4       Finally, plaintiff argues that the ALJ further erred by ignoring plaintiff's obesity

5  when formulating plaintiff's RFC.  (Pl.'s Mot. at 7.)  When evaluating obesity in order to

6  determine a claimant's RFC, the ALJ must consider "an individual's maximum remaining ability

7  to do sustained work activities in an ordinary work setting on a regular and continuing basis."

8  Burch, 400 F.3d at 683 (citations omitted).  In assessing plaintiff's RFC, the ALJ must consider

9  the limitations and restrictions imposed by all of plaintiff's impairments, even those that are not

10 severe.  Id. (quoting SSR 96-8p (1996)).  Plaintiff bears the burden of proving that her obesity

11 exacerbated her other impairments.  See Burch, 400 F.3d at 682.

12      The ALJ did not err and properly incorporated plaintiff's obesity when assessing

13 plaintiff's RFC.  The ALJ noted that in 2008, plaintiff was diagnosed with obesity.  (AT 14.)

14 The ALJ noted that the record did not indicate that plaintiff had been diagnosed with any

15 exertional or physical limitations resulting from her obesity (id.).  See Burch, 400 F.3d at 684

16 (holding that the ALJ did not err in assessing plaintiff's RFC because plaintiff failed to set forth

17 evidence, and there was no evidence in the record of functional limitations caused by plaintiff's

18 obesity).  After reviewing plaintiff's medical records, the ALJ concluded that obesity, like

19 plaintiff's other physical impairments, did not impose exertional limitations.  Plaintiff also fails

20 to specify how her obesity exacerbates her existing impairments.  Plaintiff has failed to point to

21 evidence in the record that establishes that plaintiff's remaining ability to do sustained work

22 activities was negatively impacted by her obesity.  Accordingly, the ALJ did not err in assessing

23 plaintiff's RFC.

24 ////

25 ////

26 ////

18

1    B.    Any Failure to Properly Follow 20 C.F.R. § 416.920a and HALLEX was
2          Harmless Error

3          Buried in a footnote in her motion for summary judgment, plaintiff forwards an

4    additional argument.  (Pl.'s Mot. at 4 n.1.)  She argues that the ALJ erred at step three of the

5    sequential analysis by failing to properly document findings in his decision regarding plaintiff's

6    inability to satisfy the "B" criteria of the applicable listings.  Specifically, plaintiff asserts that the

7    ALJ failed to document his findings to the level of specificity dictated by 20 C.F.R. § 416.920a

8    and HALLEX I-2-8-25C(2).

9          In order to determine whether a claimant's mental condition meets a listed

10   impairment, the ALJ must consider: (1) whether specified diagnostic criteria ("paragraph A"

11   criteria) are met; and (2) whether specified functional restrictions are present ("paragraph B"

12   criteria).  Lester, 81 F.3d at 828 (citing 20 C.F.R. § 404.1520a).  If the claimant's mental

13   impairment is severe, the ALJ must determine if it meets or is equivalent in severity to a listed

14   mental disorder.  20 C.F.R. § 416.920a(d)(2).  This determination is accomplished by comparing

15   the medical findings pertaining to the claimant's impairment "and the rating of the degree of

16   functional limitation to the criteria of the appropriate listed mental disorder."  Id.  The degree of

17   functional limitation for the first three paragraph "B" criteria are rated as none, mild, moderate,

18   marked, or extreme.  20 C.F.R. § 416.920a(c)(4).  The final paragraph "B" criteria is rated as

19   none, one or two, three, four or more.  Id.

20         Simply put, after the ALJ determines plaintiff's paragraph "A" criteria, the ALJ

21   reviews the medical findings and rates plaintiff's functional limitations to determine if they

22   satisfy the "B" criteria.  A plaintiff who satisfies the paragraph "A" criteria must be found

23   disabled if his or her impairments results in two or more functional limitations found in

24   paragraph "B."  Lester, 81 F.3d at 828-29.

25         Although the ALJ did not specifically address which paragraph "A" criterion

26   corresponds to plaintiff's impairments, plaintiff identifies 12.06 as the appropriate listing and

19

1   does not assign any error relative to evaluation of the "A" criteria.[23]  Regarding the "B" criteria

2   stated in listing 12.06, plaintiff must demonstrate that she suffers from two of the four following

3   functional restrictions to support a finding of disability: (1) marked restriction of activities of

4   daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in

5   maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each

6   of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 B.

7           The ALJ did not technically rate the four "B" criteria in accordance with 20

8   C.F.R. § 416.920a.  Instead, the ALJ stated that plaintiff's mental impairments did not result in

9   "marked limitations in two or more areas of mental functioning" and that, therefore, plaintiff's

10  impairments did not meet or medically equal one of the listed impairments under 20 C.F.R. Pt.

11  404, Subpt. P, App. 1.  (AT 14.)

12          To the extent that the ALJ's failed to properly rate plaintiff's "B" criteria, such an

13  error was harmless.  Harmless error exists when it is clear from the record that the ALJ's error

14  was inconsequential to the ultimate non-disability determination.  Tommasetti v. Astrue, 533

15  F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).  While the ALJ

16  did not "rate" all four criteria in the manner required under 20 C.F.R. § 416.920a(c)(4), he did

17  review and discuss the relevant evidence and determine that plaintiff lacked "marked"

18  impairment in two of the four required criteria.  (AT 14.)  The ALJ specifically addressed three

19  of the four criteria, writing that the "medical evidence showed that the claimant was capable of

20  activities of daily living" and that the records "do not show the presence of . . . marked

21  impairment in daily activities, social functioning or concentration."  (AT 19.)  The ALJ

22  determined that plaintiff suffered from mental impairment which had been "incorporated into the

23  established residual functional capacity."  (Id.)  As plaintiff essentially acknowledges (Pl.'s Mot.

24  at 4, n.1), the ALJ's conclusions are supported by substantial evidence in the record.

25  _____

26          [23]  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 B refers to "Anxiety Related Disorders."

1   Accordingly, the ALJ's failure to properly "rate" the four criteria was harmless.[24]

2         The ALJ also did not err by failing to document his conclusions in conformity

3   with HALLEX I-2-8-25C(2).[25]   HALLEX is not binding on the ALJ or the court.  Lockwood v.

4   Comm'r Soc. Sec. Admin., 616 F.3d 1068, 1072 (9th Cir. 2010) ("HALLEX does not impose

5   judicially enforceable duties on either the ALJ or this court.").

6         The undersigned concludes that the ALJ sufficiently discussed why plaintiff's

7   mental impairments failed to meet the paragraph "B" criteria and any error in this regard was

8   harmless.  Moreover, HALLEX is not binding on the ALJ or this court.  Accordingly, the

9   undersigned finds that the ALJ did not err at step three.

10       C.    The ALJ Erred by Failing to Utilize a VE

11         Finally, plaintiff contends that the ALJ erred by finding that plaintiff was able to

12   perform jobs in the national economy despite plaintiff's mental impairments.  Plaintiff argues

13   that her marked impairment in the ability to deal with unexpected situations that might arise in

14   the course of a workday supports a finding of disability.[26]  (Pl.'s Mot. at 5.)  Plaintiff further

15   argues that the ALJ erred by failing to utilize a VE when making this determination.  (Id.)  The

16   Commissioner argues that despite medical evidence suggesting that plaintiff "should have no

17

---

18     [24]  Plaintiff's argument in this regard appears to be a hyper-technical one, in that plaintiff
disagrees with the arrangement of the ALJ's discussion.  The ALJ's failure to organize his
19   discussion to plaintiff's liking does not constitute error.  See Lemke v. Comm'r Soc. Sec.
Admin., 380 Fed. Appx. 599, 601 (9th Cir. 2010) (unpublished) ("ALJs are no longer required to
20   attach a specific psychiatric review technique form when evaluating the severity of a claimant's
mental impairments; while the present regulations require adjudicators to document their
21   findings using the special technique, they give ALJs greater discretion in deciding how to publish
those findings").

22

23     [25]  The provisions of HALLEX relied on by plaintiff provide a list of subjects that an ALJ
"should" discuss to support the rationale for his or her findings pertaining to relevant issues and
the ultimate conclusion of the case.  See HALLEX I-2-8-25C(2).

24

25     [26]  Plaintiff argues that "Dr. Regazzi's findings of moderate to marked impairment in
ability to maintain stable emotional functioning in the workplace" also supports a finding of
disability.  (Pl.'s Mot. at 5.)  Because the undersigned finds that remand is necessary for failure to
26   consult a VE, the court does not reach this issue.

1  frequent interaction with coworkers, supervisors, or the public," there are a significant number of

2  jobs which do not require such interaction and therefore, the ALJ did not err.  (Def.'s Opp'n &

3  Cross-Motion for Summ. J. at 8.)  He further argues that the ALJ was not required to consult a

4  VE here because SSR 85-15 makes clear that there are jobs available that fit plaintiff's

5  limitations.  (Id. at 10.)

6          At step five, the burden shifts to the Commissioner to show that specific jobs exist

7  in substantial numbers in the national economy that plaintiff can perform despite his or her

8  identified limitations.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).  This burden is

9  satisfied by either "(1) applying the Medical-Vocational Guidelines ("grids") in appropriate

10  circumstances or (2) taking the testimony of a vocational expert."[27]  Id.  If the Commissioner

11  satisfies this burden, a plaintiff is not disabled and is not entitled to disability benefits.

12  Lounsbury, 468 F.3d at 1114.  If the Commissioner cannot meet this burden, the plaintiff is

13  "disabled" and entitled to disability benefits.  Id.

14          In this case, plaintiff's mental health impairments, consisting of panic attacks and

15  bipolar disorder, are non-exertional impairments.  Non-exertional limitations are those that do

16

17          [27]  The Ninth Circuit Court of Appeals has described the Medical-Vocational Guidelines, or the "grids," which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2, as follows:

18              The grids are applied at the fifth step of the analysis under 20 C.F.R. §
19              404.1520, and present, in table form, a short-hand method for determining
                the availability and numbers of suitable jobs for a claimant.  [Tackett v.
20              Apfel, 180 F.3d 1094, 1101 (9th Cir.1999).]  The grids categorize jobs by
                their physical-exertional requirements, and set forth a table for each
21              category.  A claimant's placement with the appropriate table is determined
                by applying a matrix of four factors identified by Congress - a claimant's
22              age, education, previous work experience, and physical ability.  For each
                combination of these factors, they direct a finding of either 'disabled' or
23              'not disabled' based on the number of jobs in the national economy in that
                category of physical-exertional requirements.  Id.  If a claimant is found
24              able to work jobs that exist in significant numbers, the claimant is
                generally considered not disabled.  Heckler v. Campbell, 461 U.S. 458,
                461 (1983).

25

26  Tommasetti, 533 F.3d at 1043 n.4 (modifications in original) (quoting Lounsbury v. Barnhart, 468 F.3d 1111, 1114-15 (9th Cir. 2006)).

not directly affect a claimant's strength, and include "mental, sensory, postural, manipulative, or environmental (e.g., inability to tolerate dust or fumes) limitations." Burkhart v. Bowen, 856 F.2d 1335, 1340-41 (9th Cir. 1988) (citations and internal quotation marks omitted).  Where a claimant suffers from non-exertional limitations, such as plaintiff here, the use of a VE is not mandatory unless the claimant's impairments result in significant and "sufficiently severe" non-exertional limitations.  Hoopai v. Astrue, 499 F.3d 1071, 1076 (9th Cir. 2007).

The proper inquiry is whether a claimant's non-exertional limitations are "at a sufficient level of severity such as to make the grids inapplicable to the particular case," id., i.e., whether the claimant has an impairment that limits his or her ability to work without directly affecting his or her strength.  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).  Such "non-exertional impairments, if sufficiently severe, may limit the claimant's functional capacities in ways not contemplated by the guidelines.  In such a case the guidelines would be inapplicable."  Id. (citing Desrosiers v. Sec'y. of Health and Human Servs., 846 F.2d 573, 577 (9th Cir. 1988)); see also Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988) (holding that where the plaintiff's non-exertional limitations are by themselves enough to limit his or her range of work, the testimony of a VE is necessary to identify specific jobs within the plaintiff's abilities) (citing Burkhart, 856 F.2d at 1340).

Here, the ALJ found that plaintiff's non-exertional limitations had little or no effect on the occupational base of unskilled work at all exertional levels.  However, this conclusion did not properly resolve whether plaintiff's mental impairments were of sufficient severity to impair her ability to work irrespective of any physical limitations.

As discussed above, the undersigned concludes that the ALJ properly found at step two that plaintiff's physical impairments were not severe.  Because plaintiff's severe impairments are non-exertional, SSR 85-15 provides the proper framework for determining whether a mental impairment is of sufficient severity to impair plaintiff's ability to work.  "SSR 85-15 provides guidance only for cases in which the claimant asserts solely nonexertional

23

impairments." <u>Roberts v. Shalala</u>, 66 F.3d 179, 183 (9th Cir. 1995) (internal quotation marks

omitted). "Mental impairments are generally considered to be nonexertional." <u>Id.</u> (quoting SSR

85-15 at 545) (internal quotation marks omitted).

SSR 85-15 provides in relevant part:

> The basic mental demands of competitive, remunerative, unskilled work
> include the abilities (on a sustained basis) to understand, carry out, and
> remember simple instructions; to respond appropriately to supervision,
> coworkers, and usual work situations; and to deal with changes in a
> routine work setting. *A substantial loss of ability to meet any of these
> basic work-related activities would severely limit the potential
> occupational base.* This, in turn, would justify a finding of disability
> because even favorable age, education, or work experience will not offset
> such a severely limited occupational base.

> Where there is no exertional impairment, unskilled jobs at all levels of
> exertion constitute the potential occupational base for persons who can
> meet the mental demands of unskilled work. These jobs ordinarily involve
> dealing primarily with objects, rather than with data or people, and they
> generally provide substantial vocational opportunity for *persons with
> solely mental impairments who retain the capacity to meet the intellectual
> and emotional demands of such jobs on a sustained basis*.

SSR 85-15, 1985 WL 56857, at *4 (emphasis added). Therefore, SSR 85-15 requires that all

three basic mental demands be met even in jobs where plaintiff deals primarily with objects as

opposed to data or people. A finding that plaintiff lacked one of the these three basic mental

demands compels a finding that the ALJ erred by failing to utilize a VE. <u>See Cox v. Astrue</u>, No.

C10-5021RBL, 2010 WL 3120593, at *11 (W.D. Wash. July 9, 2010) (unpublished) (stating that

where plaintiff lacks one of the three basic mental demands required under SSR 85-15, the grids

do not completely and accurately represent plaintiff's limitations and testimony from a vocational

expert is required); <u>Stark v. Astrue</u>, No. C 07-6465 MHP, 2009 WL 2566723, at *8 (N.D. Cal.

Aug. 18, 2009) (unpublished) (concluding that plaintiff's inability to respond to supervision as

required by SSR 85-15 severely limited plaintiff's potential occupational base thereby requiring

the use of a VE).

The undersigned concludes that because the record supports that plaintiff

potentially lacks one of the basic mental demands required for an unskilled occupational base,

1    the ALJ erred by relying solely on the grids.  Dr. Regazzi's findings support the conclusion that

2    plaintiff lacks the ability to perform a basic work-related activity: the ability to deal with changes

3    in routine work setting.  (AT 276.)  Dr. Regazzi determined that plaintiff had "marked

4    impairment" in her ability to deal with unexpected situations that might arise in the course of a

5    workday.[28]  (Id.)

6            Discussing Dr. Regazzi's findings, the ALJ found "that Dr. Regazzi [sic] opinion

7    is found to be reasonably well supported by medical findings and not inconsistent with the

8    overall evidence in file."  (AT 17.)  The ALJ further stated: "Dr. Regazzi reported that the

9    claimant's mental impairment is moderate and is consistent with the undersigned [sic] residual

10   functional capacity except unexpected changes in work environment.  However, there are number

11   of jobs that do not involve changes in work routine."  (Id.)  The ALJ noted that Dr. Regazzi

12   reported "marked limitations" in this area, writing that "[n]onetheless, there are many jobs that

13   do not involve changes in work routine."  (AT 18.)  Therefore, it appears that while the ALJ

14   agreed with Dr. Regazzi's opinion that a "marked" limitation would substantially impair

15   plaintiff's ability to deal with unexpected changes in work environment or routine, the ALJ found

16   that this was insufficient for a finding of disability because there were other jobs available that do

17   not implicate plaintiff's limitations.

18            Because a "marked limitation" in the ability to deal with changes in routine work

19   setting would leave plaintiff unable to meet one of the three basic mental requirements of

20   unskilled work, thereby severely limiting plaintiff's potential occupational base, the testimony of

21

22       [28]  The Commissioner argues that Dr. Regazzi's findings do not parallel the language of
     SSR 85-15.  (Def.'s Opp'n & Cross-Motion for Summ. J. at 9.)  Specifically, he argues that Dr.
23   Regazzi "was discussing Plaintiff's abilities to deal with *unexpected* situations that *might* arise"
     which is not the same as an ability to deal with changes in routine work setting.  (Id.) (emphasis
24   in original).  Because the ALJ's discussion of Dr. Regazzi's findings demonstrates the ALJ's
     belief that Dr. Regazzi's limitations parallel the language of  SSR 85-15, the undersigned
25   declines the Commissioner's invitation to make this distinction.  (See AT 17 (demonstrating the
     ALJ's use of the terms "unexpected changes in work environment" and "changes in work
26   routine" interchangeably when discussing Dr. Regazzi's report).)

a VE was necessary to identify specific jobs within plaintiff's abilities.  Accordingly, the ALJ

erred by failing to utilize a VE, and the undersigned will remand this matter for further

proceedings.

        Plaintiff argues that because plaintiff's mental impairments "impose restrictions

on basic work-related mental functions" remand is not necessary and this court should order that

benefits be paid.  (Pl.'s Mot. at 8.)  The decision of whether to remand for further proceedings or

simply to award benefits is within the court's discretion.  <u>McAllister v. Sullivan</u>, 888 F.2d 599,

603 (9th Cir. 1989).  Generally, the court should direct the award of benefits in cases where no

useful purpose would be served by further administrative proceedings.  <u>Varney v. Sec'y of Health

and Human Servs.</u>, 859 F.2d 1396, 1399 (9th Cir. 1988).  The undersigned finds that the ALJ's

reliance on the grids was improper and that the ALJ was required to consult a VE.  Because a VE

must testify about whether there are jobs that plaintiff may perform despite a potentially severe

limitation in her ability to deal with changes in routine work setting, the undersigned concludes

that remand is appropriate.  Although the court understands the importance of expediting

disability claims, <u>Varney</u>, 859 F.2d at 1401, remanding this case for further administrative

proceedings will serve a useful purpose in the resolution of this case.  On remand, the ALJ must

determine whether plaintiff's mental impairments allow her to meet the basic work-related

activities required under SSR 85-15.[29]  The ALJ must also take the testimony of a VE to

determine whether there are jobs in the national economy that plaintiff is able to perform despite

her mental limitations.

V.    <u>CONCLUSION</u>

        For the foregoing reasons, IT IS HEREBY ORDERED that:

        1.     Plaintiff's motion for summary judgment (Dkt. No. 17) is granted in part

---

[29]  The undersigned notes that there appears to be a conflict between the opinions of Dr.
Canty and Dr. Regazzi that was not adequately addressed by the ALJ and may have a bearing on
whether plaintiff is "markedly limited" in her ability to deal with changes in routine work setting.

and denied in part;

       2.     Defendant's cross-motion for summary judgment (Dkt. No. 19) is granted in part and denied in part; and

       3.     This case is remanded to the ALJ for further proceedings consistent with this order pursuant to 42 U.S.C. § 405(g), sentence four.  The Clerk of Court is directed to enter a separate judgment herein, as provided for under Rules 58 and 79(a) of the Federal Rules of Civil Procedure.  See Shalala v. Schaefer, 509 U.S. 292, 296-97 (1993).

DATED:  December 13, 2010


_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE